IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF DEARBORN POLICE AND FIRE REVISED RETIREMENT SYSTEM (CHAPTER 23), MARTIN ROSSON, and NOAH WRIGHT, on behalf of themselves and all other similarly situated former stockholders of TERRAFORM POWER, INC., | § § § § § § § § | No. 241, 2023 |
| | § | Court Below: Court of Chancery of the State of Delaware |
| Plaintiffs Below, Appellants, | § § | |
| v. | § § | C.A. No. 2022-0097 |
| | § | |
| BROOKFIELD ASSET MANAGEMENT INC., BROOKFIELD INFRASTRUCTURE FUND III GP LLC, ORION US GP LLC, ORION US HOLDINGS I LP, HARRY GOLDGUT, BRIAN LAWSON, RICHARD LEGAULT, SACHIN SHAH, JOHN STINEBAUGH, BROOKFIELD RENEWABLE PARTNERS, L.P., and BROOKFIELD RENEWABLE CORPORATION, | § § § § § § § § § § § § § § | |
| Defendants Below, Appellees. | | |

Submitted: January 17, 2024
Decided: March 25, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED**.

Ned Weinberger, Esquire, Mark Richardson, Esquire, Brendan W. Sullivan, Esquire (*argued*) Labaton Sucharow LLP, Wilmington, Delaware. Peter B. Andrews, Esquire, Craig J. Springer, Esquire, David M. Sborz, Esquire, Jackson E. Warren, Esquire, Andrews & Springer LLC, Wilmington, Delaware. *Of Counsel:* John Vielandi, Esquire, Labtaton Sucharow LLP, New York, New York. Jeremy Friedman, Esquire, David Tejtel, Esquire, Friedman Oster & Tejtel PLLC, Bedford Hills, New York, Douglas E. Julie, Esquire, W. Scott Holleman, Esquire, Garam Choe, Esquire, Julie & Holleman LLP, New York, New

York. Brian J. Robbins, Esquire, Stephen J. Oddo, Esquire, Robbins LLP, San Diego, California *for Appellants*.

Kevin G. Abrams, Esquire, Eric A. Veres, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware. *Of Counsel:* John A. Neuwirth, Esquire (*argued*), Stefania D. Venezia, Esquire, Amanda K. Pooler, Esquire, Elizabeth M. Sytsma, Esquire, Tanner S. Stanley, Esquire, Weil, Gotshal & Manges LLP, New York, New York *for Appellees*.

**VALIHURA**, Justice:

*INTRODUCTION*

This is an appeal of the Court of Chancery's bench ruling granting Defendants Below-Appellees' motion to dismiss in full. Plaintiffs Below-Appellants filed suit in the Court of Chancery challenging a squeeze-out merger (the "Merger"). They asserted several breach of fiduciary duty claims. Defendants argued that the claims must be dismissed because the Merger satisfied the elements of *Khan v. M & F Worldwide Corp.* ("*MFW*")[1] — entitling the board's actions to business judgment review. The Court of Chancery, in a telephonic ruling, granted Defendants' motion to dismiss.[2]

On appeal, Appellants raise two claims of error. First, they assert that the trial court erred in finding that they failed to adequately allege coercion under *MFW*. Second, they assert that the trial court erred in finding that *MFW* was satisfied because they failed to adequately plead that the proxy statement was materially deficient.

We affirm the trial court's dismissal of the coercion claim. As to the second claim, we conclude that the minority stockholders were not adequately informed of certain alleged conflicts of interest between the special committee's advisors and the counterparty to the Merger. The Court of Chancery recognized that this was a close call, and we agree. But, upon a review of the record, we hold that the Court of Chancery erred as to certain of the disclosure issues concerning the special committee's financial and legal advisors' conflicts

---

[1] 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

[2] *See* Court of Chancery's telephonic bench ruling on June 9, 2023 [hereinafter "Bench Ruling"]. Opening Br., Ex. A.

of interest.

Accordingly, we REVERSE the Court of Chancery's judgment.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. The Parties[4]

Plaintiffs Below-Appellants are City of Dearborn Police and Fire Revised Retirement System (Chapter 23) ("Dearborn"), Martin Rosson, and Noah Wright (collectively, "Appellants"). Prior to the Merger, they were stockholders of TerraForm Power, Inc. ("TerraForm"). TerraForm was a Delaware corporation with its principal place of business in New York City. TerraForm acquired, owned, and operated solar and wind energy facilities in North America and Western Europe. TerraForm completed its IPO on July 23, 2014.

Defendants Below-Appellees are affiliates, officers, and other executives of Brookfield Asset Management Inc. ("BAM"), an alternative asset manager (collectively, "Brookfield").[5] Defendant BEP is an exempted limited partnership formed under the laws

---

[3] The facts, except as otherwise noted, are taken from the Verified Amended Stockholder Class Action Complaint filed on June 21, 2022 [hereinafter "complaint" or "Compl."] and the Bench Ruling. In this procedural posture, they are presumed to be true.

[4] When addressing the lower court proceedings, we refer to Appellants as "Plaintiffs" and Appellees as "Defendants."

[5] BAM is a Canadian corporation with its principal executive offices in Toronto. BAM conducts its business primarily through direct and indirect subsidiaries, many of which are Delaware entities. A37 (Compl. ¶¶ 16, 17). In their complaint, Plaintiffs defined the Brookfield defendants to include: Brookfield Infrastructure Fund III GP LLC ("BIF"), Orion US GP LLC ("Orion GP"); Orion US Holdings I LP ("Orion LP"), Brookfield Renewable Partners, L.P. ("BEP"), and Brookfield Renewable Corporation ("BEPC"). A30 (Compl., Introduction). Also named as defendants were: Harry Goldgut, Brian Lawson, Richard Legault, Sachin Shah, and John Stinebaugh.

of Bermuda and is an affiliate of Brookfield. BAM and BEP controlled TerraForm. Defendant BEPC is a corporation incorporated under the laws of British Columbia and is an affiliate of Brookfield. Defendant John Stinebaugh served as Managing Partner in Brookfield's Infrastructure Group and served, at all relevant times, as TerraForm's Chief Executive Officer under a 2017 governance agreement between TerraForm and Brookfield. Defendants Brian Lawson, Harry Goldgut, Richard Legault, and Sachin Shah were each, at all relevant times, senior executives of Brookfield and served on the TerraForm board (the "Director Defendants").

## B. Background of the Private Placement

On March 6, 2017, Brookfield entered into an agreement to acquire 51% of TerraForm's outstanding Class A common stock pursuant to a merger and sponsorship transaction agreement.[6] The transaction was completed on October 16, 2017, after which Brookfield became TerraForm's controller.[7] Soon thereafter, TerraForm and Brookfield entered into several ancillary agreements that granted Brookfield the right to control significant aspects of TerraForm's governance. Specifically, Brookfield acquired the exclusive power to appoint TerraForm's Chief Executive Officer, Chief Financial Officer, and General Counsel.[8] And as long as Brookfield qualified as TerraForm's controlling

---

[6] A42 (Compl. ¶¶ 34, 35).

[7] The trial court noted that TerraForm's subsequent SEC filing disclosed that it was a "controlled company[,]" and that Brookfield's interests may diverge from those of the public stockholders. Bench Ruling 5–6.

[8] These three executive officers are not employees of TerraForm and their services are provided under a management services agreement with BAM and certain of its affiliates. A307 (Veres Aff., Ex. 1) (Proxy at 139).

stockholder under applicable exchange listing rules, Brookfield would have the right to designate four of TerraForm's seven board members. Brookfield designated Lawson, Goldgut, Legault, and Shah as TerraForm board members, and they served at the time of the Merger.

Under TerraForm's charter, the three remaining board members were required to be "independent" as defined under SEC and NASDAQ rules and regulations. The three independent board members at the time of the Merger were: Mark McFarland, Carolyn Burke, and Christian Fong. These independent directors formed the conflicts committee ("Conflicts Committee"), which reviewed and approved material transactions that potentially posed a conflict of interest between Brookfield and TerraForm.

In January 2018, Brookfield presented TerraForm with the opportunity to acquire Saeta Yield, S.A. (or "Saeta") for $1.2 billion (the "Saeta Acquisition"). Saeta was a publicly-traded Spanish yield company that owned and operated wind and solar energy assets. Saeta was an attractive target for TerraForm because TerraForm's management predicted that the acquisition would cause an increase in average dividends per share of 6.5% over the first five years — creating more than $100 million in incremental value for its stockholders.[9] At first, TerraForm's management believed that the company could fund the Saeta Acquisition with its existing liquidity.[10] However, as negotiations progressed, Brookfield's and TerraForm's management presented a proposal to the Conflicts

---

[9] A53 (Compl. ¶ 54); Bench Ruling at 7.

[10] Plaintiffs alleged that TerraForm had the debt capacity to fund most — if not all — of the $1.2 billion purchase price for Saeta. A82 (Compl. ¶ 111).

6

Committee that envisioned raising between $600 and $700 million through an equity issuance in the public markets. On February 6, 2018, the Conflicts Committee approved a financing plan that included $800 million of TerraForm's available funds and $400 million in public equity issuances including a backstop agreement for Brookfield to purchase all of the unpurchased equity in the offering for $10.66 per share (the "Backstop").[11] TerraForm's stockholders approved the equity issuance at TerraForm's annual meeting on May 23, 2018.[12]

Soon after the stockholder vote, the TerraForm board held a meeting and discussed increasing the equity issuance and the Backstop from $400 million to $650 million. In a subsequent Conflicts Committee meeting, Brookfield stated that it preferred that the entire $650 million equity offering be a backstopped private placement with Brookfield itself (the "Private Placement"). The Conflicts Committee, in turn, approved the Private Placement on June 4, issuing $650 million in equity in a private placement to Brookfield at a per-share price of $10.66. This transaction increased Brookfield's ownership of TerraForm's outstanding common stock from 51% to 65.3%. With this Private Placement funding, TerraForm executed the tender offer for Saeta's shares and then acquired it through a short form merger on July 2, 2018.[13]

---

[11] TerraForm publicly announced the Saeta Acquisition on February 7, 2018, and filed a Form 8-K containing details of the financing proposal the following day. A69 (Compl. ¶ 75).

[12] Bench Ruling at 8. On May 3, 2018, TerraForm commenced a tender offer to acquire Saeta.

[13] A81 (Compl. ¶ 108). TerraForm's stock price increased in the aftermath of the Saeta Acquisition and by June 25, 2018, TerraForm's stock was trading at $11.77 per share, 10.4% above the $10.66 per share Private Placement price, representing an unrealized profit of $68 million to Brookfield. A81 (Compl. ¶ 109).

In response to the Private Placement, TerraForm stockholder, Martin Rosson, filed a derivative and class action complaint in the Court of Chancery on September 19, 2019, challenging the Private Placement as unfair to TerraForm's minority stockholders. Soon thereafter, on January 27, 2020, another stockholder, Dearborn, filed its own class action and derivative complaint in the Court of Chancery similarly challenging the Private Placement. The complaint asserted claims against certain Brookfield affiliates arising out of Brookfield's purchase of $650 million in shares of TerraForm stock to finance TerraForm's acquisition of Saeta.[14] The trial court consolidated the actions on February 13, 2020, and designated the complaint filed by Dearborn as the operative complaint in the consolidated action (the "Private Placement Action").[15]

## C. Background of the Merger

Early in 2020, Brookfield's subsidiary, BEP, made an all-stock proposal on January 11 to acquire the remaining outstanding shares of TerraForm other than the 62% already owned by Brookfield.[16] BEP's offer contemplated an exchange ratio of 0.36x for each share of TerraForm stock. BEP's proposal stated that it had no interest in selling any of its

---

[14] The case was captioned *In re TerraForm Power, Inc. S'holders Litig.*, Consol. C.A. No. 2019-0757.

[15] A88 (Compl. ¶ 126).

[16] A88 (Comp. ¶ 127). In October 2019, TerraForm conducted a $250 million public offering for 14,907,573 shares of common stock at a price of $16.77 per share. Concurrently, Brookfield entered into a second private placement purchasing 2,981,514 shares of TerraForm common stock for $16.77 per share. A363 (Veres Aff., Ex. 1) (Proxy at 199). As a result, Brookfield's equity percentage decreased from 65.3% to 61.5%. The Proxy states that the January 11, 2020 offer represented a premium of 11% over the unaffected closing price of the TerraForm common stock on January 10, 2020, based on the unaffected closing price of BEP units as of such date. A315 (Veres Aff., Ex. 1) (Proxy at 151).

shares or participating in any alternative merger involving a third party. Additionally, because this was a squeeze-out merger, BEP conditioned its proposal on the approval of an independent special committee and a majority of the minority stockholders in an effort to comply with the *MFW* requirements.

### 1. *The Special Committee is Formed*

TerraForm's board convened to discuss the proposal the same day. After the board meeting, the Conflicts Committee met to discuss forming a special committee. The Conflicts Committee contemplated that the special committee would have the same members as the Conflicts Committee with McFarland serving as Chair.[17] The Conflicts Committee also discussed financial advisors and decided to request presentations from Greentech Capital Advisors Securities LLC ("Greentech") and Morgan Stanley & Co. LLC ("Morgan Stanley"). The board executed a unanimous written consent on January 12, 2020, to form a special committee consisting of Burke, Fong, and McFarland (Chair) (the "Special Committee").

The TerraForm board granted the Special Committee the exclusive power and authority to: (i) review and evaluate the terms and conditions of the offer, and determine its advisability and any alternative thereto; (ii) negotiate with BEP or any other party as the Special Committee deemed appropriate with respect to the offer or any alternative thereto; (iii) determine whether the offer or any alternative thereto negotiated by the Special Committee was fair to, and in the best interests of TerraForm and all of its stockholders

---

[17] A92 (Compl. ¶ 138).

9

other than BEP and its affiliates; (iv) reject the offer and any other alternative transaction and recommend to the TerraForm board what action, if any, should be taken; and (v) take any and all other actions it deemed necessary and advisable in light of any offer or alternative thereto. The board also delegated to the Special Committee the authority to retain its own legal and financial advisors. The Special Committee retained Richards, Layton & Finger, P.A. ("RLF") as its legal advisor.

### 2. The Special Committee's Retention of Advisors

Consistent with this authority, the Special Committee met on January 12, 2020 to discuss the offer and retain a financial advisor. It interviewed Greentech, who had previously served as a financial advisor to the Conflicts Committee. In its January 12 presentation, Greentech told the Special Committee that "(a) it was not the optimal time to realize maximum value for TerraForm[,] (b) third parties might be willing to value [TerraForm]'s minority stake higher than Brookfield, and (c) a robust market check is a must to ensure maximum value for TerraForm's public shareholders, and to execute the Special Committee[']s fiduciary duty[.]"[18] Greentech also highlighted that Brookfield's offer came at a time when the relative exchange ratio between BEP and TerraForm share prices was at a twelve-month low from TerraForm's perspective.

TerraForm signed an engagement letter that same day with Greentech.[19] The

---

[18] A93 (Compl. ¶ 141) (internal quotation marks omitted).

[19] We note that the Proxy states that the Special Committee decided to retain Greentech on January 13, not January 12 as alleged in the complaint. A316 (Veres Aff., Ex. 1) (Proxy at 152). This difference is not material to our analysis. Greentech's $6 million fee "was contingent, with Greentech being paid for providing a fairness opinion recommending a transaction and upon closing of such a transaction." A98 (Compl. ¶ 145).

10

Special Committee convened the next day to hear a presentation from Morgan Stanley. In its January 13, 2020 presentation, Morgan Stanley noted that Brookfield would realize significantly increased management services fees by consolidating TerraForm into BEP. Morgan Stanley deemed Brookfield's expected increase in management fees from any transaction to be "a Key Consideration for the Special Committee" that would warrant a higher premium.[20] Morgan Stanley also stated that a market check might be impracticable because Brookfield's majority ownership might have a negative effect on a third party's willingness to introduce an outside bid. The Special Committee signed an engagement letter with Morgan Stanley on January 17 for Morgan Stanley to serve as a financial advisor to the transaction.[21]

Both Brookfield and TerraForm had previously engaged Morgan Stanley in prior, unrelated matters. Morgan Stanley had received $65 to $90 million in fees from Brookfield in the prior two years and had received $5 to $15 million in fees from TerraForm in the same period. Additionally, Morgan Stanley and its affiliates held a collective stake of $470 million in Brookfield-related entities, and Morgan Stanley was concurrently serving as a lender and participant in certain financings for Brookfield affiliates. Morgan Stanley's

---

[20] A99 (Compl. ¶ 147). Morgan Stanley explained that Brookfield's management fee would increase because BEP's management fee structure was based on market capitalization and would allow Brookfield to realize significantly increased management service fees simply by consolidating TerraForm into BEP. A98–A99 (Compl. ¶ 147).

[21] Morgan Stanley's "entire $13 million fee was contingent, with Morgan Stanley being paid for providing a fairness opinion recommending a transaction and upon closing of such a transaction." A101 (Compl. ¶ 152).

engagement letter did not disclose those conflicts.[22] At least as alleged, the Special Committee never asked for a conflicts disclosure from Morgan Stanley, nor did it attempt to mitigate Morgan Stanley's conflicts through limitations on its representation or supervision of its negotiations or interactions with Brookfield.

Third, shortly after retaining its financial advisors, the Special Committee retained Kirkland & Ellis LLP ("Kirkland") as its legal counsel for the Merger. Kirkland had previously advised Brookfield affiliates on prior unrelated transactions and was also concurrently advising Brookfield on a separate equity investment. None of this information was disclosed to the Special Committee. In fact, despite this prior relationship and concurrent representation of Brookfield, Kirkland told the Special Committee "that it did not have any conflicts of interest that would affect its ability to serve as legal counsel to the [Special] Committee[.]"[23] The Special Committee never requested a conflict disclosure from Kirkland, nor did it discuss the appropriateness of Kirkland serving as the Special Committee's legal advisor given Kirkland's prior relationship and concurrent representation of Brookfield.

### 3. Negotiations with Brookfield Proceed

The Special Committee met with both Greentech and Morgan Stanley on January 29, 2020, to discuss the diligence necessary to evaluate a potential transaction with

---

[22] A1142 (Weinberger Aff., Ex. 1) (Morgan Stanley Engagement Letter) ("Morgan Stanley has confirmed that there are no (i) current, active and material engagements of Morgan Stanley, or (ii) material engagements of Morgan Stanley that have been active during the two-year period prior to the date of this letter agreement, directly by: [Brookfield], to provide financial advisory or financing services to such entities for which fees paid to Morgan Stanley exceeded $100,000.").

[23] A103 (Compl. ¶ 155) (internal quotation marks omitted).

Brookfield. Greentech and Morgan Stanley discussed a Barclays research report that predicted the positive effect on BEP from an acquisition of TerraForm at Brookfield's proposed 0.36x exchange ratio. Greentech and Morgan Stanley attributed at least part of the accretion to a thirty-five-basis-point improvement from refinancing TerraForm debt under BEP's investment grade balance sheet and removing TerraForm's existing management service fees.[24]

At a meeting on February 4, 2020, the Special Committee advised Greentech and Morgan Stanley that they should not consider transactions with alternative third parties because Brookfield had stated in its initial offer that it would not consider alternative transactions.

The Special Committee met again on February 6, 7, 11, and 18 to discuss Greentech's and Morgan Stanley's other diligence findings. The Special Committee decided against soliciting alternatives due to the very low probability that a third party would have an interest in, and ability to, present a proposal that offered more value to TerraForm's stockholders in view of Brookfield's position.

On January 29, 2020, Dearborn submitted a letter to the board demanding that the Special Committee ensure that the derivative claims of the Private Placement Action be given adequate weight in negotiations. Dearborn's January 29 letter claimed that potential damages from the Private Placement Action could exceed $400 million based on TerraForm's then-trading stock price. Dearborn also requested an in-person meeting with

---

[24] A104 (Compl. ¶157); Bench Ruling at 12–13.

the Special Committee to discuss the value of these claims and to ensure that they were factored into the purchase price.

When the Special Committee did not respond to this initial outreach, Rosson and Dearborn sent a letter on February 13. The letter expressed concerns that the Special Committee did not intend to obtain fair value for the claims in negotiating a potential merger. Rosson and Dearborn claimed that the total damages could now exceed $576 million because of increases to TerraForm's stock price. As with the earlier letter, Rosson and Dearborn requested an in-person conference with the Special Committee. The Special Committee's counsel forwarded both letters to the Special Committee.

The Special Committee requested that its counsel consider the effect of the Private Placement Action on negotiations and discussed counsel's analysis at its meeting on February 19. The Special Committee concluded that the claims had, at most, a *de minimis* value and were not sufficiently material to factor into the negotiation of economic terms of the proposed transaction. The Special Committee declined to meet with Dearborn and Rosson.

The Special Committee met again on February 26, 2020 to receive presentations from Greentech and Morgan Stanley regarding their respective financial analyses of the 0.36x exchange ratio offered by Brookfield. Both advisors discussed the implications of rejecting the offer. Greentech stated that TerraForm depended on Brookfield for growth, but it noted that BEP's five-year forecasts for TerraForm excluded future growth at the TerraForm level. Greentech's analysis showed that TerraForm's implied exchange ratio would be reduced from an overall valuation range of 0.33x–0.44x to 0.24x–0.34x when

14

excluding growth. It advised the Special Committee that one of the "Key Valuation Issues" was that TerraForm was "nearly fully reliant on Brookfield for growth[,]" and that without Brookfield's continued support absent a deal, TerraForm's value would plummet.[25] Greentech reported that TerraForm management's and BEP's five-year forecasts for TerraForm did not align because "BEP's model excludes future growth at the [TerraForm] level[.]"[26] Greentech summed up the issues by pointing out that agreeing to a deal with Brookfield would alleviate the concerns about the ability and willingness of BEP to grow TerraForm as a standalone entity.

Morgan Stanley also highlighted that TerraForm was dependent on Brookfield for future growth and that rejecting Brookfield's offer could sour the relationship, which Plaintiffs translated into a potential for "Brookfield to retaliate by denying [TerraForm] growth opportunities[.]"[27] Plaintiffs alleged that "Brookfield's refusal to commit to supporting [TerraForm]'s future growth plans in the absence of a merger had the effect of coercing the Special Committee into agreeing to a deal."[28]

Morgan Stanley's presentation also relayed that Brookfield was incentivized to purchase TerraForm to reduce its interest expense and increase its management fees from TerraForm by refinancing its debt after the Merger.[29] Morgan Stanley calculated the net

---

[25] A110 (Compl. ¶ 170) (internal quotation marks omitted).

[26] A111 (Compl. ¶ 171) (internal quotation marks and citation omitted).

[27] A112 (Compl. ¶ 172); Bench Ruling at 15.

[28] A113 (Compl. ¶ 173).

[29] According to Plaintiffs, Morgan Stanley determined that Brookfield could receive significant interest expense savings (worth $1.77 per share to Brookfield) and incremental management fee increases (worth $1.19 per share to Brookfield) from TerraForm refinancing its debt pursuant to

present value to Brookfield from this debt refinancing at over $1 billion.

Finally, according to the Plaintiffs, the presentations by both Morgan Stanley and Greentech demonstrated that Brookfield's offer was opportunistic, as it occurred when the implied exchange ratio "was nearly the lowest it had been in two years, significantly favoring Brookfield."[30]

After these presentations, the Special Committee decided to maintain its course and not solicit any third-party interest in a transaction given Brookfield's stated unwillingness to support an alternative transaction, but agreed to re-raise the issue if negotiations with Brookfield faltered. The Special Committee proposed a counteroffer to Brookfield of a 0.42x exchange ratio and a list of noneconomic terms. Brookfield agreed to most of the noneconomic terms, including that TerraForm's minority stockholders would have the option to receive stock in either a limited partnership entity or a corporation under the Brookfield umbrella.

The parties then went back and forth on the exchange ratio. On March 6, 2020, Brookfield countered with a ratio of 0.365x, which Morgan Stanley and Greentech estimated would be dilutive to TerraForm's stockholders' dividends per share. The Special Committee met with its advisors to discuss the offer and determined that an exchange ratio of over 0.37x would be economically advantageous to minority stockholders.

---

or after the Merger, which Morgan Stanley calculated had a net present value to *pro forma* Brookfield of over $1 billion. A137 (Compl. ¶ 216).

[30] A115 (Compl. ¶ 175).

On March 10, 2020, the Special Committee responded with a 0.40x exchange ratio.[31] On March 11, Brookfield countered with a 0.37x exchange ratio. The same day, the Special Committee countered with a 0.39x exchange ratio and determined that it would not accept any counter from Brookfield of less than a 0.38x exchange ratio. Brookfield refused the 0.39x offer and responded with a counteroffer of 0.375x.

On March 12, the Special Committee and Brookfield engaged further with the Special Committee pressing its 0.39x offer and Brookfield indicating that it was unwilling to agree to a ratio of 0.39x and was unwilling to go higher than 0.38x. The Special Committee then proposed an exchange ratio of 0.381x, which Brookfield accepted.[32] The Special Committee asked its financial advisors to present their analyses on March 16, 2020.

The Special Committee met with Greentech and Morgan Stanley on March 16, 2020. Both advisors delivered their opinions that the transaction was financially fair to TerraForm's minority stockholders. Using BEP's closing price on March 13, the 0.381x exchange ratio yielded an implied purchase price for TerraForm's stock of $16.34 per share.[33] Based on BEP's March 15, 2020 closing share price, the implied consideration was $14.36 per share (which was below the values calculated by Morgan Stanley and

---

[31] It appears that the trial court mistakenly stated that the Special Committee's March 10, 2020 counteroffer was a 0.41x exchange ratio instead of 0.40x. Bench Ruling at 17; A119 (Compl. ¶ 180).

[32] A322 (Veres Aff., Ex. 1) (Proxy at 158). According to the Proxy, the 0.381x exchange ratio represented "(i) a premium of 17% to the unaffected closing price of $15.60 per share of [TerraForm] common stock on January 10, 2020, based on the closing price of $38.07 per BEP unit as of such date and (ii) a premium of 20% to the closing price of $12.01 per share of [TerraForm] common stock on March 16, 2020 . . . ."

[33] A123 (Compl. ¶ 189).

Greentech).[34]    Greentech and Morgan Stanley presented a host of valuations for TerraForm's stock under different conditions and assumptions.    The mid-point of Greentech's valuation pegged TerraForm's per-share value at $15.375 per share.  The mid-point in Morgan Stanley's valuations priced TerraForm at $18 per share.[35]  Based on the number of TerraForm shares outstanding as of the signing of the Merger Agreement, the Merger valued TerraForm at approximately $3.3 billion.

After noting that BEP's five-year forecasts for TerraForm did not include any growth at the TerraForm level and that "[TerraForm] is fully dependent on Brookfield for future growth," Greentech explained that excluding growth from TerraForm's projections would significantly reduce its implied valuation range for TerraForm.[36]  Greentech presented financial analyses for TerraForm under both scenarios depending on whether Brookfield would support TerraForm's future growth.  Morgan Stanley also reiterated that Brookfield had substantial influence over TerraForm and could significantly impact TerraForm's ability to execute its business plan.

After receiving these presentations, the Special Committee recommended that the board approve Brookfield's offer at an exchange ratio of 0.381x.  On March 16, 2020,

---

[34] Plaintiffs alleged that the implied $14.36 per share value of the Merger consideration was significantly below Greentech's sum-of-the-parts going-concern valuation of TerraForm of $19.60 to $21.53 based on management's growth plan.  A138–A139 (Compl. ¶ 217).  They alleged that it was also below Morgan Stanley's DCF valuation for TerraForm based upon TerraForm's net asset value, five-year business plan, and dividend discount model.  A139 (Compl. ¶ 218).  Finally, they alleged that the implied $14.36 per share value was below Wall Street analysts' price targets for TerraForm.  A140 (Compl. ¶ 219).

[35] Bench Ruling at 17–18; A121 (Compl. ¶ 186).

[36] A120 (Compl. ¶ 185).

18

TerraForm's directors convened to consider the offer.[37]  All directors present voted to approve the Merger, and the board instructed authorized officers to prepare and file a proxy statement concerning the proposed Merger.

### D. *The Proxy Disclosure*

TerraForm filed its proxy statement soliciting a stockholder vote on the proposed Merger on June 29, 2020 (the "Proxy").[38]  As noted by the trial court, the Proxy was "light on details" concerning the Special Committee's advisors' diligence throughout the process and did not include specifics about any third-party interests.  The Proxy did disclose that both TerraForm and Brookfield had previously engaged Morgan Stanley and the fees earned from those engagements for the past two years.  The Proxy disclosed that "the [TerraForm] acquisition will likely provide a number of significant benefits to the Brookfield Renewable group[.]"[39]  Specifically, the acquisition would simplify the

---

[37] A324 (Veres Aff., Ex. 1) (Proxy at 160); A125–A126 (Compl. ¶¶ 192, 193).  The Bench Ruling states that the Board approved the Merger on March 12.  Bench Ruling at 18.  This appears to be an error.  *See also* A752–A759 (Veres Aff., Ex. 25) (Minutes of a Meeting of the Special Committee dated March 16, 2020); A765–A767 (Veres Aff., Ex. 26) (Minutes of a Meeting of the Board of Directors of TerraForm Power, Inc. dated March 16, 2020).

[38] Because the Plaintiffs in the Private Placement Action ceased to be stockholders of TerraForm following the Merger, they could no longer maintain their derivative claims, and the court dismissed those claims.  The defendants in the Private Placement Action filed a motion to dismiss the direct claims in the Private Placement Action which was argued on July 16, 2020.  The Court of Chancery denied the motion on October 30, 2020.  *See In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859 (Del. Ch. 2020).  On December 14, 2020, this Court accepted an interlocutory appeal and issued a decision on September 20, 2021 reversing.  *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251 (Del. 2021).  We held that plaintiffs' remaining purportedly direct claims were actually derivative claims for which they lacked standing, and we overruled *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006).  Because the Merger had extinguished the derivative claims, the Private Placement Action ended.

[39] A330 (Veres Aff., Ex. 1) (Proxy at 166).

Brookfield Renewable Group's ownership structure, eliminate public company costs, expand Brookfield's portfolio in North America and Western Europe, and increase Brookfield's annual $20 million management fee by 1.25% of Brookfield's increased post-Merger value. Additionally, the Proxy disclosed that the Merger would be accretive to Brookfield's cash flows. The Proxy disclosed that the Merger's impact on dividends was uncertain — "there can be no assurance that Brookfield Renewable or BEPC will make comparable distributions or dividends in the future[.]"[40] It also disclosed the existence of the Private Placement Action but stated that the action had a *de minimis* value and, therefore, was not of much relevance.

### E. The Court of Chancery Proceedings

Plaintiffs filed their original complaint in this action in the Court of Chancery on January 28, 2022. Defendants subsequently filed their motions to dismiss. The parties then submitted a dismissal of Burke, Fong, and McFarland, which the trial court granted on June 15, 2022. On June 21, Plaintiffs filed the operative amended complaint seeking damages for Defendants' alleged breach of fiduciary duties stemming from the Merger. The amended complaint asserted three counts. In Count I, Plaintiffs alleged that the Brookfield entities breached their fiduciary duties in their capacity as controller. In Count II, Plaintiffs alleged that the Director Defendants breached their fiduciary duties in approving the Merger and issuing a misleading Proxy. In Count III, Plaintiffs alleged that Stinebaugh, in his capacity as CEO, breached his fiduciary duties by participating in,

---

[40] A405 (Veres Aff., Ex. 1) (Proxy at 241); Bench Ruling at 44.

20

preparing, and disseminating the Proxy. Generally, Plaintiffs alleged that Defendants failed to satisfy the framework set forth by this Court in *MFW*. Consequently, in their view, the Merger must be analyzed under the exacting entire fairness standard as opposed to the business judgment standard of review.

Defendants, in turn, moved to dismiss the complaint on August 26, 2022, pursuant to Rules 12(b)(1) and 12(b)(6). They argued that Plaintiffs' claims were deficient because the transaction satisfied the elements of *MFW*, entitling the board's actions to the business judgment standard of review. The motion was fully briefed, and the trial court heard oral argument on February 14, 2023. Of the six *MFW* factors, Plaintiffs did not contest three: that Brookfield conditioned the transaction *ab initio* on approval of the Special Committee and a majority of the minority stockholders; that the Special Committee was independent; and that there was no coercion of the minority stockholders.

Instead, Plaintiffs focused their challenge on the third, fourth, and fifth factors arguing that, because the Special Committee was not fully empowered, it failed to meet its duty of care, and the stockholder vote was not informed. They argued that Brookfield had furnished the Special Committee with a set of projections that excluded any growth at TerraForm, and that these projections implicitly threatened that Brookfield would prevent TerraForm's growth if the Special Committee rejected the Merger. They alleged that the Special Committee ultimately acquiesced and recommended a Merger at a sub-optimal price.

The trial court granted Defendants' motion to dismiss in full following a telephonic bench ruling on June 9, 2023. In granting the motion to dismiss, the court determined that

Plaintiffs had failed to demonstrate that the dual prongs of the *MFW* framework were not met in the transaction — those two prongs being the approval of a wholly independent special committee and a majority of the minority stockholders. The court issued a letter supplementing the ruling on June 21, 2023, and issued an order dismissing the complaint on June 23, 2023.

The trial court held that Plaintiffs failed to adequately allege coercion under *MFW* because the allegedly coercive conduct was less extreme than that alleged in *In re Dell Techs. Inc. Class V S'holders Litig.*,[41] which we discuss in more detail later. Unlike in *Dell*, Plaintiffs did not allege that Brookfield signaled that it intended to "bypass" the formal process if the Special Committee chose not to approve the transaction. In short, the trial court concluded that Plaintiffs' theory of coercion depended upon attenuated and unreasonable inferences.

The trial court then addressed Plaintiffs' claims that the Special Committee failed to satisfy its duty of care by (i) failing to conduct a market check, (ii) selecting conflicted advisors, and (iii) assigning *de minimis* value to the derivative Private Placement Action claims.[42] It rejected all three claims.

---

[41] 2020 WL 3096748 (Del. Ch. 2020).

[42] On June 21, 2023, the Court of Chancery issued a supplemental letter ruling regarding the valuation of the Private Placement Action's derivative claims based on *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455 (Del. Ch. 2013), *adopted by Morris v. Spectra Energy Partners (DE) GP, LP*, 246 A.3d 121 (Del. 2021). Plaintiffs did not appeal this ruling which concluded that Plaintiffs lacked standing to challenge the fairness of the Merger. We do not address the issue further herein.

As to the market check theory, relying on *BridgeBio Pharma*,[43] the trial court ruled that a failure to conduct a market check can be a factor supporting a claim challenging a sale process, but in this case, it did not impugn the Special Committee's exercise of due care and did not constitute gross negligence.

The court next addressed Plaintiffs' claim that the Special Committee breached its duty of care by selecting Morgan Stanley and Kirkland — both of whom were conflicted. The court approached the issue by focusing on whether the conflicts were material. Starting with Morgan Stanley, the trial court stated that when a plaintiff challenges financial advisors' independence based on its holdings in the counterparty, whether the advisor's financial interest in the transaction is material can inform the analysis.[44] In this case, Plaintiffs challenged Morgan Stanley's $470 million stake in Brookfield entities and its concurrent representation of Brookfield in an unrelated financing matter. Although the trial court determined that the $470 million stake was not material, it expressed its discomfort with the facts:

> I'll be honest, I don't love the fact that Morgan Stanley has this level of financial ties to the controller. But plaintiffs have not pled facts sufficient for this to give rise to a duty of care violation by the special committee. Morgan Stanley was one of two financial advisors to the special committee. Its ownership stake was small relative to its overall holdings, constituting only .1 percent of its portfolio value. This court has found that an investment bank's holdings in a counterparty amounting to .16 percent of its overall portfolio was insufficient to create a material conflict. The plaintiffs have failed to provide a compelling rationale as to why this case should come out differently. Moreover, the fees Morgan Stanley had accrued from both

---

[43] *Smart Local Unions and Councils Pension Fund v. BridgeBio Pharma, Inc.*, 2022 WL 17986515 (Del. Ch. 2022), *aff'd,* 303 A.3d 51, 2023 WL 5091086 (Del. 2023) (ORDER).

[44] Bench Ruling at 29–30.

Brookfield and TerraForm were disclosed in the proxy, demonstrating that the special committee knew of these payments.[45]

The trial court similarly dispensed with Plaintiffs' claims against Kirkland as follows:

> Plaintiffs point to Kirkland's prior representation of Brookfield affiliates and its concurrent work for Brookfield on an unrelated equity transaction as a basic carbon copy. Again, I do not love these alleged conflicts. I wish Kirkland had not concurrently represented Brookfield in an unrelated equity transaction. But the allegations fail to cast doubt on the reasonableness and the good faith nature of the special committee's decision to hire Kirkland following its own diligence. Plaintiffs do not allege that Kirkland represented Brookfield or its affiliates as counterparties to the merger or on any related transaction.[46]

The court concluded its discussion of the Morgan Stanley and Kirkland conflicts/due care claims by concluding that Plaintiffs had not alleged any facts suggesting that "the special committee was grossly negligent in hiring Kirkland[]"[47] or that they were entitled "to an inference of gross negligence simply because the special committee, knowing of this issue, still retained Morgan Stanley."[48] The court then summed up its due care analysis as follows:

> Taken separately and in the aggregate, plaintiffs' allegations fail to impugn the special committee's exercise of [due] care. The special committee convened at least 19 times between February and March 2020 and engaged in feedback with advisors. It successfully bid up the deal price from the initial proposed .36 ratio to a .381 ratio with favorable noneconomic terms. Plaintiffs failed to plead a reasonably conceivable basis to find that the

---

[45] *Id.* at 30.

[46] *Id.* at 31.

[47] *Id.*

[48] *Id*. at 30–31.

special committee acted with gross negligence.[49]

Next, the court addressed the disclosure claims. It determined that it had already addressed seven of the nine categories of claims. Because it viewed its decision on the due care claims as having mooted the seven, it addressed them summarily.

To start, the court rejected Plaintiffs' first two claims that the Proxy improperly omitted Greentech's view about the need for a market check and Greentech's view that it was not an optimal time for a transaction. For the market check issue, the court based its reasoning on its prior conclusion that the Special Committee had reasonably concluded that a market check was not needed. As for the timing issue, the court concluded that the statement was merely part of a pitch and that Greentech had ultimately recommended in favor of the transaction at the 0.381x exchange ratio.

Third, the court dispensed with Plaintiffs' theory that the Proxy failed to disclose Brookfield's coercion of the Special Committee by saying that it had "rejected the theories of coercion rendering this disclosure immaterial."[50] Fourth, it rejected Plaintiffs' disclosure claim regarding the value of the derivative Private Placement claims.

In a similar vein, the court rejected Plaintiffs' fifth and sixth claims that the Proxy failed to disclose material information regarding Morgan Stanley's and Kirkland's conflicts because the court had already found that Plaintiffs failed to plead "that Morgan Stanley or Kirkland were meaningfully conflicted as to the merger, rendering those

[49] *Id.* at 33.

[50] *Id.* at 35.

omissions immaterial."[51]  Seventh, the court rejected Plaintiffs' claim that the Proxy failed to disclose how the Special Committee managed Morgan Stanley's and Kirkland's conflicts.  It summarily held that "similar to disclosures regarding the alleged conflict, the omission was immaterial."[52]

The court more closely examined the final two disclosure categories: (i) the benefits Brookfield stood to receive from the Merger (including both increased management fees and the interest expense savings if it opted to refinance TerraForm's debt); and (ii) the dilutive effect of the Merger on dividends.  As to the management fees, the court was satisfied with the Proxy's statement that the acquisition would "likely provide a number of significant benefits to Brookfield," including simplifying BEP's ownership structure, eliminating public company costs, and generating increased cash flows.[53]  In addition, the Proxy disclosed "the method for calculating Brookfield's management fees, an annual management fee of $20 million, plus 1.25 percent of the amount by which the market increased."[54]  Accordingly, it held that "the management fees were fully described."[55]  The question for the court was "whether the proxy adequately disclosed Morgan Stanley's presentation that Brookfield's five-year gain in management fees would be approximately $130 million."[56]

---

[51] *Id.*

[52] *Id.* at 36.

[53] *Id.* at 37 (internal quotation marks omitted).

[54] *Id.*

[55] *Id.* at 38.

[56] *Id.*

26

Although it found the question to be a "close call," the trial court concluded that this was "the kind of level of detail that doesn't have to be disclosed."[57] It was persuaded that "[t]he disclosure states the exact same methodology that Morgan Stanley used to calculate its $130 million five-year projection."[58] Also, the Proxy disclosed BEP's management fees for the preceding year and "[s]tockholders had enough information to ascertain that Brookfield would receive an increased management fee following the merger."[59] Thus, the court held that the stockholders "were not entitled to further detail in this case."[60]

As to the debt refinancing issue, the trial court held that the alleged omission of the benefits of the debt refinancing fell into the category of hypothetical information. The court ruled that the Proxy disclosed what was certain at the time, namely, Brookfield's outstanding debt, the maturity dates, and the interest rates. A reasonable investor could conclude that refinancing would be advantageous to Brookfield. Beyond that, "[r]equiring a target to disclose their own calculations of hypothetical benefits to an acquirer, a decision over which the target itself has no control, would not necessarily assist stockholders in making an informed vote."[61]

Finally, as for the dilutive effect of the Merger on dividends, the court concluded that the Proxy disclosed the known, certain information by disclosing both TerraForm's

---

[57] *Id.*

[58] *Id.* at 40.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 43.

and Brookfield's forecasted standalone dividends per share. Morgan Stanley relied on these forecasts to calculate the expected dilution to TerraForm's stockholders following the Merger. The court found that "[a] stockholder could reach the same conclusion on their own."[62] To conclude, on the whole, the court rejected Plaintiffs' disclosure challenges.

Plaintiffs filed a Notice of Appeal on July 6, 2023.

*F. Contentions on Appeal*

Appellants raise several arguments on appeal. First, Appellants argue that judicial cleansing is unavailable under *MFW* because they adequately pleaded that the Special Committee had been coerced. The lynchpin of this assertion is that Brookfield threatened the Special Committee by signaling that it would block TerraForm's future growth if it did not agree to a deal with Brookfield.

Second, they contend that judicial cleansing is unavailable under *MFW* because they adequately pleaded that material facts were either not disclosed or were disclosed in a misleading fashion in the Proxy. In particular, they assert that the trial court erroneously rejected their arguments that the Proxy failed to disclose: (i) the Special Committee's advisors' conflicts of interest; (ii) the Special Committee's failure to apprise itself of its legal and financial advisors' conflicts by seeking routine conflict disclosures, and that Morgan Stanley and Kirkland concealed their conflicts from the Special Committee; (iii) the benefits that Brookfield stood to receive from the Merger in the form of increased management fees and the $1 billion in interest expense savings from refinancing its debt;

---

[62] *Id.* at 44.

(iv) that the Merger would be dilutive to TerraForm's minority stockholders; and (v) Greentech's caution to the Special Committee that it was a suboptimal time to sell and that a market check was imperative.

## II. STANDARD OF REVIEW

"We review *de novo* the dismissal by the Court of Chancery of a complaint under Rule 12(b)(6)."[63] "At the motion to dismiss stage, we must 'accept as true all of the plaintiff's well-pleaded facts,' and 'draw all reasonable inferences' in plaintiff's favor."[64] A motion to dismiss should be denied if the facts pled support a reasonable inference that the plaintiff can succeed on his claims.[65]

## III. ANALYSIS

### A. The Coercion Claim was Properly Dismissed

#### 1. The MFW Framework and Relevant Aspects at Issue

In *In re Tesla Motors, Inc. S'holder Litig.*,[66] we reviewed the development of our law concerning certain procedural devices that could alter the burden of proof in a conflicted transaction. We observed that *MFW* held that "'the business judgment standard appl[ies] to controller freeze-out mergers where the controller's proposal is conditioned on both Special Committee approval and a favorable majority-of-the-minority vote[.]'"[67]

---

[63] *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) (internal citation omitted).

[64] *Olenik v. Lodzinski*, 208 A.3d 704, 714 (Del. 2019) (quoting *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013)).

[65] *Id.*

[66] 298 A.3d 667 (Del. 2023).

[67] *Id.* at 707 (quoting *MFW*, 88 A.3d at 639).

*MFW* adopted the following standard:

> To summarize our holding, in controller buyouts, the business judgment standard of review will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority.[68]

Both procedural protections must be "established *prior to trial*[.]"[69]  And when they are established, the transaction is then afforded the deferential business judgment standard of review.  Under Delaware's business judgment rule, "'the board's decision will be upheld unless it cannot be attributed to any rational business purpose.'"[70]

### 2.   *The Court of Chancery Correctly Dismissed the Coercion Claim*

Appellants' argument that the Special Committee was coerced "hinges on its contention that, in diligence, BEP's management provided TerraForm with a financial model that did not include growth for TerraForm."[71]  Appellants' key piece of evidence is the single set of No Growth Projections.  They argue that submission of this "no growth" model was an "implicit threat" from Brookfield that, "if the special committee

---

[68] *Id.* at 707–08 (quoting *MFW*, 88 A.3d at 645 (emphasis in original)).  In *Synutra*, we clarified that "[t]o avoid one of *Lynch*'s adverse consequences—using a majority-of-the-minority vote as a chit in economic negotiations with a Special Committee—*MFW* reviews transactions under the favorable business judgment rule if 'these *two protections are established up-front*.'"  195 A.3d at 762 (quoting *MFW*, 88 A.3d at 644) (emphasis added)).

[69] *MFW*, 88 A.3d at 646 (emphasis in original).

[70] *Telsa,* 298 A.3d at 708 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) (internal quotation marks and citation omitted)).

[71] Bench Ruling at 24.

recommended against the transaction, Brookfield would let TerraForm wither on the vine."[72]

According to Appellants, the Special Committee and its advisors understood Brookfield's message and its capacity for retribution.[73] They point to the Special Committee's advisors' various warnings regarding TerraForm's reliance on Brookfield for its planned growth and TerraForm's limited ability to operate without Brookfield's continued support, including Morgan Stanley's warning that:

> While any subsequent decrease in [TerraForm]'s stock price resulting from Brookfield's actions would have a near-term impact on the value of Brookfield's stake in [TerraForm], it could also give Brookfield an opportunity to re-bid for the outstanding Class A shares at a lower price at a later point in time.[74]

Appellants also highlight the following note in Greentech's presentation: "Note: [TerraForm] management's 5-year forecast does not align with BEP management's 5-year forecast for [TerraForm] (BEP's model excludes future growth at the [TerraForm] level)."[75] They argue that Brookfield's "implicit threat" undermined the Special Committee's ability to bargain at arms-length and to definitively say "no."

Appellees argue that it would not make sense for Brookfield to "punish a company in which it owned 62% of the equity for an indefinite period of time simply to negotiate a

---

[72] *Id.*

[73] As noted earlier, when addressing the appellate proceedings, we refer to the Plaintiffs-Below as "Appellants."

[74] A112–A113 (Compl. ¶ 172).

[75] A952 (Veres Aff., Ex. 38) (Greentech Presentation to the Special Committee dated February 26, 2020, at 12); A111 (Compl. ¶ 171).

better deal for the remaining 38%."[76]

The Court of Chancery held that deducing a threat from these facts "requires inferring that Brookfield through BEP was trying to send a message by submitting its five-year financials exclusive of TerraForm's growth, and that the special committee perceived this as a threat, and . . . felt deprived of a meaningful choice as a result."[77] It found Plaintiffs' implicit coercion claim to be a "stretch" and "inconsistent with the type of coercion allegations that [the Court of Chancery] has found to defeat this element of *MFW*."[78] We agree with the trial court's rejection of the "implicit coercion" claim.

First, the Note and five-year financials upon which Appellants' implicit coercion claim is based, as well as the statements by the financial advisors, reflected the reality that existed in this sponsor-backed, controlled company — namely, that Brookfield had substantial control and influence over TerraForm and TerraForm was fully reliant on Brookfield for growth. The Proxy disclosed Brookfield's substantial control over

---

[76] Answering Br. at 24 (internal quotation marks omitted). *See also In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 662 (Del. Ch. 2013) ("Delaware law presumes that large shareholders have strong incentives to maximize the value of their shares in a change of control transaction.") (internal citation omitted)). Moreover, Brookfield's statement in its offer that it would not support transactions other than its preferred deal also does not suggest a type of coercion that would defeat *MFW's* application. *MFW*, 88 A.3d at 651 ("Moreover, under Delaware law, MacAndrews & Forbes had no duty to sell its block, which was large enough, again as a practical matter, to preclude any other buyer from succeeding unless MacAndrews & Forbes decided to become a seller."); *BridgeBio Pharma*, 2022 WL 17986515, at *11 ("[A] controlling stockholder is not required to accept a sale to a third party or to give up its control, and its stated refusal to do so does not preclude review under the *MFW* framework.").

[77] Bench Ruling at 26.

[78] *Id*. at 24.

TerraForm.[79]  It also described the suite of agreements entered into by TerraForm and Brookfield and certain of its affiliates providing for various services, sponsorship, and governance arrangements.[80]

The Special Committee's advisors recognized that "[TerraForm] is fully dependent on Brookfield for future growth[.]"[81]  The Special Committee was independent, disinterested, and actively engaged in arms-length bargaining resulting in increased consideration for the benefit of the minority stockholders.  On appeal, Appellants have abandoned the duty of care claim they pressed against the Special Committee below.[82]

---

[79] A247 (Veres Aff., Ex. 1) (Proxy's Introduction Letter) (referencing Brookfield's ownership of 62% of TerraForm's outstanding shares).  The Proxy also highlighted other aspects of Brookfield's control over TerraForm:

> Brookfield also is able to control the appointment and removal of BEPC's directors and the directors of BEP's general partner and, accordingly, exercises substantial influence over BEPC and BEP. Simultaneously with the completion of the [TerraForm] acquisition, BEPC intends to enter into voting agreements with BEP and certain indirect subsidiaries of Brookfield to transfer the power to vote their respective shares held of TerraForm Power (or its successor entity) to BEPC.  As a result, BEPC (and indirectly BEP) will control and consolidate [TerraForm] upon completion of the [TerraForm] acquisition.

A368 (Veres Aff., Ex. 1) (Proxy at 204).

[80] See A359–A361 (Veres Aff., Ex. 1) (Proxy at 195–97).

[81] A703 (Veres Aff., Ex. 24) (Greentech Presentation to the Special Committee dated March 16, 2020, at 18)); A691 (Veres Aff., Ex. 24) (Id. at 6) ("With no in-house project development efforts and no/limited M&A staff, [TerraForm] is nearly fully reliant on the Sponsors for growth[.]").

[82] In this case, Appellants confirmed during oral argument that they were not pursuing a due care claim against the Special Committee:

> **The Court**:  Is your disclosure claim attempting to encompass at all the duty of care exercised by the Special Committee?  Because much of your brief and the complaint complains about the Special Committee sort of taking at face value the Morgan Stanley statements that they had no material engagements with Brookfield and that they never asked for a conflicts disclosure form, same with Kirkland.  So, is it strictly limited to disclosure or are you really trying to articulate a care claim?

33

According to the Proxy, the Special Committee met at least nineteen times during the transaction process. It caused Brookfield to raise its bid on four occasions, achieving an increase in the exchange ratio to 0.381x from 0.36x, along with securing non-economic concessions. It considered a number of factors regarding TerraForm's financial condition and standalone prospects, including TerraForm's potential near- and long-term performance on a standalone basis, its financial projections prepared by management, and the role of and reliance on Brookfield as TerraForm's sponsor.[83] It is not reasonably conceivable that there was an attempt to bypass the Special Committee, or that its ability to freely negotiate and bargain effectively was impeded by the submission of the "no-growth" financials. We agree with the Chancellor that the implicit coercion claim rests on attenuated and unreasonable inferences.

Second, as the Chancellor observed, *Dell* is distinguishable:

Unlike in *Dell*, plaintiffs do not allege that Brookfield indicated publicly and privately that it intended to "bypass" the formal process if the special committee chose not to approve the transaction, nor that it had a "contingency plan" to do so. Plaintiffs' allegations fail to carry the day on *MFW*'s third prong.[84]

But Appellants are correct that the court in *Dell* recognized that even more subtle conduct may be coercive.[85] In *Dell*, a company had partially financed an acquisition by

---

**Counsel**: No, it's strictly limited to disclosure at this point. We did challenge those aspects below and we have not appealed them.

Oral Argument, at 16:12–58, https://vimeo.com/903752923.

[83] A326–A327 (Veres Aff., Ex. 1) (Proxy at 162–63).

[84] Bench Ruling at 26–27.

[85] *See In re Dell Techs. Inc. Class V S'holders Litig.*, C.A. No. 2018-0816, at 40 (Del. Ch. Mar. 13, 2020) (TRANSCRIPT) (observing that, "[t]he stereotypical mobster is more subtly caring by

issuing new shares of Class V stock. The company retained the option to force a conversion of the Class V shares to Class C stock. That was the least attractive option for the Class V holders.[86] When the company later sought to consolidate the holdings in that target, its board charged the special committee with negotiating a redemption of the Class V shares, conditioned upon the *MFW* requirements. The redemption would have been more favorable to the Class V stockholders, but looming in the back of the process, the company wielded its less advantageous forced conversion right.

The Court of Chancery in *Dell* found it to be reasonably conceivable that the special committee had been coerced in light of plaintiffs' allegations that there was "a steady drumbeat of actions by which the Company signaled its intent to exercise the Conversion Right in the absence of a negotiated redemption."[87] For example, during the negotiation period, the company had leaked to the press that it was considering taking action to exercise the conversion,[88] reiterated its right to do so, and disclosed in SEC filings that it has

---

saying, 'You better be careful on the way home. I'd hate for something to happen to you.' That's subtle, that's indirect, but fairly communicative."); *see also Dell*, 2020 WL 3096748, at *29 ("[A] controller's explicit or *implicit threats* can prevent a committee from fulfilling its function and having a concomitant effect on the standard of review.") (emphasis added) (citing *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 n.38 (Del. Ch. 2009) (noting that a controller can undermine the effectiveness of a committee by engaging in "threats, coercion, or fraud"))).

[86] The Class V shares were subject to a conversion right whereby if the company listed its Class C shares on a national exchange, then it could forcibly convert the Class V shares into Class C shares pursuant to a pricing formula. *Dell*, 2020 WL 3096748, at *1.

[87] *Id.* at *31.

[88] The company leaked to *Bloomberg* that it was considering an initial public offering of the Class C stock. An initial public offering would have enabled the company to exercise the conversion right. After publication of that article, the trading price of the Class V stock plummeted. *Id*. at *6.

explored exercising the conversion right as a contingency plan if the redemption negotiations fell through. By reserving the right to bypass the special committee and engage in a forced conversion, it was reasonably conceivable that the company created a coercive environment that undermined the special committee's ability to bargain effectively and effectively disempowered the committee.[89]

The illustrations given in *Dell* also supported the inference that the stockholders had an incentive to vote in favor of the transaction for reasons other than its merits, rendering the stockholder vote ineffective for purposes of *MFW*.[90] By contrast, the allegations here do not logically support an inference of coercion.

---

[89] In particular, the court in *Dell* determined that:

> By failing to include the exercise of the Conversion Right within the definition of a Potential Class V Transaction and the universe of actions that the Company would not take without satisfying the twin-*MFW* conditions, the Company failed to comply with the requirements of *MFW*. The Company did not empower the Special Committee and the Class V stockholders with the ability to say no.

*Id*. at *16. In other words, the scope of the special committee's mandate in *Dell* was insufficient to satisfy *MFW*. *Id*. at *17 ("By excluding the Forced Conversion from the scope of the Special Committee's authority, the Company deprived the Special Committee of the full power to say 'no' that is necessary for *MFW* to function."). That is not the case here. The Special Committee here was fully empowered and independent. As the Chancellor noted, "Plaintiffs do not dispute that the special committee was facially empowered to complete these tasks by the board's unanimous written consent." Bench Ruling at 24.

[90] *Dell*, 2020 WL 3096748, at *35. The court observed that "what mattered for purposes of coercing the Special Committee and the Class V stockholders was the Company's repeated references to the possibility of exercising the Conversion Right." *Id*. at *34.

B.      *The Disclosure Issues*

1.      *The Special Committee's Advisors' Conflicts*

a.      *Morgan Stanley's $470 Million Investment in Brookfield*

We next address the Proxy's omission of Morgan Stanley's $470 million investment in Brookfield.  Appellants maintain that the Proxy's failure to disclose Morgan Stanley's $470 million holdings in Brookfield was a material omission that rendered the minority stockholders' vote uninformed.  They also highlighted Morgan Stanley's other financial engagements with Brookfield:  Morgan Stanley received tens of millions of dollars in advisory fees from Brookfield prior to the Merger and Morgan Stanley concurrently advised Brookfield affiliates.  The trial court, with some hesitation, held that Plaintiffs failed to plead sufficient facts to give rise to a duty of care violation by the Special Committee.  Relying on the Court of Chancery's decision in *Micromet*,[91] the trial court resolved the due care claim by holding that Morgan Stanley's conflict was not material given the size of Morgan Stanley's stake in Brookfield compared with the size of Morgan Stanley's overall portfolio.[92]  It then resolved the disclosure issue by referring back to its due care analysis.

The trial court's analysis is problematic.  First, whether the Special Committee breached its duty of due care in the retention of the advisors does not adequately address the question of whether the conflict was sufficiently material to require disclosure in the

---

[91] *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785 (Del. Ch. 2012).

[92] Bench Ruling at 30.

Proxy. Second, that materiality determination must include an examination of the alleged omission from the perspective of the stockholder, not just a comparative analysis based upon the overall size of the advisor's portfolio of business.

The legal standard for determining whether a special committee breached its duty of care in hiring and managing its advisors is whether it is reasonably conceivable that the committee exhibited "gross negligence."[93] By contrast, whether a special committee's advisor's conflicts were material information requiring disclosure is a different inquiry. Our Court recently described the "materiality" standard in *Morrison v. Berry*:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Framed differently, an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. But, to be sure, this materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.[94]

"'Materiality is to be assessed from the viewpoint of the 'reasonable' stockholder . . . .'"[95] Therefore, we first consider whether the Proxy's omission of Morgan Stanley's $470 million stake in Brookfield was material from the stockholders' perspective.

The Proxy disclosed the following information concerning Morgan Stanley's

---

[93] *Synutra*, 195 A.3d at 768 ("[T]he Court of Chancery appropriately read *MFW* as requiring it to determine, under the high standard of gross negligence, whether the plaintiff had stated a due care claim.").

[94] 191 A.3d 268, 282–83 (Del. 2018) (internal quotation marks omitted) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting the standard set forth in *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))).

[95] *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 18 (Del. Ch. 2002) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

relationship with Brookfield and its affiliates:

> In the two years prior to the date it rendered its opinion in connection with the [TerraForm] acquisition, in addition to the services described in this proxy statement/prospectus, Morgan Stanley and its affiliates provided financial advisory services to TerraForm Power and its affiliates, and received aggregate fees of approximately $5 to $15 million in connection with such services. In addition, in the two years prior to the date it rendered its opinion in connection with the [TerraForm] acquisition, Morgan Stanley and its affiliates provided financial advisory or financing services for BEP or its affiliates, including certain portfolio companies or affiliates of BAM (an affiliate of BEP), and received aggregate fees of approximately $65 to $90 million in connection with such services.[96]

> As of March 1, 2020, Morgan Stanley or one of its affiliates was a lender and a participant in certain financings for certain affiliates of BAM, which in each case is unrelated to the transactions contemplated by the transaction documents and for which Morgan Stanley would expect to receive additional customary fees if such transactions are completed.[97]

> In addition, Morgan Stanley, its affiliates, directors or officers, including individuals working with the Special Committee in connection with the [TerraForm] acquisition, *may* have committed and *may* commit in the future to invest in private equity funds managed by BAM or its affiliates.[98]

It is reasonably conceivable that from the viewpoint of a stockholder, Morgan Stanley's nearly half a billion-dollar holding in Brookfield was material and would have been material to a stockholder in assessing Morgan Stanley's objectivity. Delaware law places great importance on the need for transparency in the special committee's reliance on its advisors: "'it is imperative for the stockholders to be able to understand what factors

---

[96] A344 (Veres Aff., Ex. 1) (Proxy at 180).

[97] *Id.*

[98] A345 (Veres Aff., Ex. 1) (Proxy at 181) (emphasis added).

might influence the financial advisor's analytical efforts . . . .'"[99] Further, "[b]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, [the Court of Chancery] has required full disclosure of investment banker compensation and potential conflicts."[100]

It does not matter whether the financial advisor's opinion was ultimately influenced by the conflict of interest; the presence of an undisclosed conflict is still significant: "'[t]here is no rule . . . that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict.'"[101] Although the size of the investment vis-à-vis the size of Morgan Stanley's overall portfolio may be considered in the analysis, the stockholder's perspective is paramount.

In any event, *Micromet* is distinguishable. *Micromet* involved plaintiff-shareholders of a target company seeking a preliminary injunction to enjoin an all-cash negotiated tender offer made by a large biopharmaceutical company — Amgen. The plaintiffs argued that the price of the offer was unfair and was the result of an unfair process and that the disclosure materials recommending the tender offer contained materially false

---

[99] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 860 (Del. 2015) (quoting *In re Rural Metro Corp.*, 88 A.3d 54, 105 (Del. Ch. 2014) (internal citation omitted)). *See also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) (requiring disclosure of a CEO's conflict of interest, when the CEO acted as a negotiator and observing that, "a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

[100] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 832 (Del. Ch. 2011) (internal citation omitted); *Kihm v. Mott*, 2021 WL 3883875, at *17 (Del. Ch. 2021), *aff'd*, 276 A.3d 462, 2022 WL 1054970 (Del. 2022) (ORDER).

[101] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16.

and misleading information. One of the plaintiffs' alleged disclosure deficiencies concerned the board's failure to disclose the amount of fees paid by Micromet to its financial advisor in the transaction, Goldman Sachs, and Goldman Sachs' holdings of both Micromet's and Amgen's stock.[102] Goldman held approximately $336 million in Amgen stock, representing approximately 0.16% of its overall investment holdings.

In this case, Morgan Stanley's holdings in Brookfield amounted to 0.10% of its total investment portfolio — an amount less than Goldman's holdings in a counterparty in *Micromet*. But in *Micromet*, Goldman's holdings in Amgen were largely held "on behalf of its clients."[103] Here, Morgan Stanley's stake in Brookfield was invested for its own benefit.[104] And unlike Morgan Stanley here, it is not apparent that Goldman provided any concurrent advisory services to Amgen or its affiliates during the challenged transaction. In sum, the trial court needed to examine the materiality question not just by looking at the stake in comparison to Morgan Stanley's overall portfolio, but also by looking at its materiality to the TerraForm stockholders. We conclude that the $470 million investment, when viewed from the perspective of a reasonable stockholder, was material and should have been disclosed.

Further, the Proxy's use of the word "may" in addressing Morgan Stanley's holdings in Brookfield was misleading. [105] "Just as disclosures cannot omit material information,

---

[102] *Micromet*, 2012 WL 681785, at *11.

[103] *Id.*

[104] A100 (Compl. ¶ 150).

[105] This point was candidly addressed by Brookfield's counsel at oral argument:

41

disclosures cannot be materially misleading."[106]  In *Morrison*, we explained the standard

for evaluating whether partial disclosures are materially misleading:

> As we said in *Arnold v. Society for Savings Bancorp, Inc.*, "once defendants traveled down the road of partial disclosure of the history leading up to the Merger . . . they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." And, in *Zirn v. VLI Corp.*, we explained that, "even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[107]

The use of "may" in the Proxy is misleading because Morgan Stanley had indeed

already invested nearly half a billion dollars.[108]  This misleading language also makes it

less likely that a stockholder would have been prompted to locate Morgan Stanley's

Brookfield holdings in its publicly filed form 13F.

---

> **The Court**: [Counsel], I have a couple questions on the half a billion-dollar stake issue.  First of all, the Proxy said Morgan Stanley may have committed and may commit in the future to invest in private equity funds.
>
> **Counsel**: Yeah.
>
> **The Court**: So that's not exactly saying straight up that they had in fact invested $470 million dollars.
>
> **Counsel**: It's not.  And I think that's the same, but the answer is, it's not.  It says may, it doesn't say has, but stockholders could gather that information from the 13F, which did have . . . .
>
> . . . .
>
> **The Court**: But that part of the schedule wasn't in our record.
>
> **Counsel**: I believe the only thing that's in the record is the information showing the entire size of Morgan Stanley's portfolio.

Oral Argument, at 36:39–37:54, https://vimeo.com/903752923.

[106] *Morrison*, 191 A.3d at 283.

[107] *Id*. (alteration in original) (quoting *Arnold*, 650 A.2d at 1280, and then quoting *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996)).

[108] A877 (Veres Aff., Ex. 35) (Morgan Stanley Form 13F) (Feb. 14, 2020).

### b.   Kirkland's Conflicts were Problematic

We turn next to the Proxy's non-disclosure of Kirkland's conflicts of interest.  The trial court similarly held that Plaintiffs failed "to cast doubt on the reasonableness and the good faith nature of the special committee's decision to hire Kirkland following its own diligence."[109]  It held that Plaintiffs "have not alleged any facts suggesting that the special committee was grossly negligent in hiring Kirkland."[110]

Again, the trial court resolved the disclosure issue by applying the "gross negligence" standard in determining whether the Special Committee breached its duty of care in hiring and managing Kirkland.  It then summarily dismissed the disclosure claim.  To resolve the issue of whether the Proxy was deficient for failing to disclose Kirkland's conflicts, we instead ask whether a reasonable stockholder would consider the information regarding Kirkland's conflicts important in deciding how to vote.[111]  Again, because an advisor's concurrent engagement with a transaction counterparty can present legitimate concerns regarding the advisor's objectivity, we disagree with the Chancellor's determination that those representations were not material.[112]

---

[109] Bench Ruling at 31.

[110] *Id.*

[111] *See Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997) ("[P]rofessional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito*.").  *See also Harcum v. Lovoi*, 2022 WL 29695, at *21 (Del. Ch. 2022) ("Although advisor conflicts should be disclosed, a plaintiff must provide sufficient facts to establish that the conflict or potential conflict was *material*.") (internal citation omitted) (emphasis added)).

[112] *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *43 (Del. Ch. 2018) (finding that an advisor's "ongoing relationship with [a transaction counterparty] gave [the advisor] a powerful incentive to maintain good will and not push too hard during the negotiations.") (internal

Kirkland's conflicts at issue involved prior representations of Brookfield and its affiliates and a concurrent representation of a Brookfield affiliate on an unrelated transaction. Kirkland's prior representations of Brookfield and its affiliates included: (i) advising Brookfield Infrastructure Partners L.P. concerning its over $500 million term loan facility from December 2019 to January 2020;[113] (ii) representing Brookfield Super-Core Infrastructure Partners on the sale of its $2 billion Cove Point interest to Dominion Energy, Inc. in the fall of 2019, as well as a separate engagement with Brookfield in late 2019 to finance that transaction;[114] and (iii) counseling Brookfield Business Partners L.P. on its take-private of Teekay Offshore Partners L.P. during the Fall of 2019.[115] Kirkland concurrently advised BAM on its $260 million equity investment in Superior Plus Corp. when serving as the Special Committee's legal counsel.[116]

The Proxy failed to disclose Kirkland's prior and concurrent conflicts. Even though, standing alone, Kirkland's prior conflicts with Brookfield may not have been sufficient to state a claim,[117] we hold that it is reasonably conceivable that the details of Kirkland's

---

quotation marks and citation omitted)), *aff'd*, 211 A.3d 137, 2019 WL 2144476 (Del. 2019) (ORDER).

[113] A102 (Compl. ¶ 154).

[114] A102–A103 (Compl. ¶ 154).

[115] A103 (Compl. ¶ 154).

[116] *Id.*

[117] *See, e.g., In re Inergy L.P.*, 2010 WL 4273197, at *14 (Del. Ch. 2010) (declining to enjoin a transaction and concluding that a financial advisor's "prior dealings" with a counterparty to the proposed transaction "[did] not show that [the transaction committee]'s decision to retain [that advisor] . . . was unreasonable[.]"); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *22 n.104 (Del. Ch. 2017) (an "advisor's prior dealings with a counterparty to a transaction, *standing alone*, will not be adequate to plead a conflict of interest.") (emphasis added)).

conflicts, and particularly, the concurrent conflict, were material facts for stockholders that required disclosure.[118] Kirkland's ongoing relationship with Brookfield raises the legitimate concern that Kirkland might not want to push Brookfield too hard given the nature of their ongoing lawyer-client relationship which includes the ethical duty of zealous advocacy.

The Court of Chancery, in *In re PLX Tech. Inc* ("*PLX*"),[119] drew a similar conclusion concerning a special committee's advisor's concurrent conflict. *PLX* involved an activist campaign that pressured PLX into a sale. A potential bidder soon emerged and expressed an interest in purchasing PLX. The potential bidder was represented by Deutsche Bank on an unrelated acquisition, the same financial advisor that concurrently represented PLX's special committee. In addressing Deutsche Bank's concurrent representation on an unrelated transaction, the court stated that "Deutsche Bank's ongoing relationship with [the bidder] gave it a powerful incentive 'to maintain good will and not push too hard' during the negotiations."[120]

Appellants are not contending that the existence of such conflicts is necessarily disabling. Rather, they contend that at the very least, Kirkland's material conflicts should

---

[118] *See Tornetta v. Maffei*, C.A. No. 2019-0649, at 18 (Del. Ch. Feb. 23, 2021) (TRANSCRIPT) (describing a proxy's omission of an advisor's concurrent engagement with a counterparty on an unrelated transaction as a glaring deficiency).

[119] 2018 WL 5018535.

[120] *Id.* at *43 (quoting *In re Rural Metro Corp.*, 88 A.3d at 94); *see also Harcum*, 2022 WL 29695, at *21 (addressing plaintiff's allegation concerning a legal advisor's conflicts: "[a]lthough advisor conflicts should be disclosed, a plaintiff must provide sufficient facts to establish that the conflict or potential conflict was material.") (internal citation omitted)).

have been disclosed to stockholders. We agree that the stockholders were entitled to know about these conflicts so that they could consider them and decide for themselves how to weigh the advice in light of them.[121] Accordingly, we hold that it is reasonably conceivable that the details of Kirkland's conflicts were material and should have been disclosed.

### 2. *The Special Committee's Failure to Apprise Itself of its Advisors' Conflicts*

Next, Appellants argue that the Proxy failed to disclose material information concerning the Special Committee's handling of its advisors' conflicts. The trial court summarily held that "similar to disclosures regarding the alleged conflict, the omission [of how the Special Committee managed Morgan Stanley's and Kirkland's conflicts] was immaterial."[122] Appellants contend that the Proxy should have disclosed that the Special Committee merely accepted at face-value and without proper follow-up, the advisors' conclusory representations that they had no material conflicts.

We have already determined that it is reasonably conceivable that Kirkland's and Morgan Stanley's conflicts were material and should have been disclosed in the Proxy. Although a proxy disclosure must disclose material facts to stockholders, Delaware law does not require boards to engage in "self-flagellation" in their public disclosures.[123]

---

[121] *See, e.g., David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *14 (Del. Ch. 2008) ("[S]tockholders are entitled to know what material factors, if any, may be motivating the financial advisor."); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *17 ("[T]he compensation and potential conflicts of interest of the special committee's advisors are important facts that generally must be disclosed to stockholders before a vote.").

[122] Bench Ruling at 36.

[123] *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. 2018) (citing *Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992)).

46

Appellants are correct that as alleged, the Special Committee's process in retaining advisors was flawed.[124]  But, as noted above, Appellants have abandoned their due care claim on appeal.  We think that it is sufficient that we have ruled that certain of the advisors' conflicts were material and should have been disclosed.

### 3. The Failure to Adequately Disclose the Benefits Brookfield Stood to Receive

Next, we address the Proxy's failure to disclose the "extraordinary benefits" that Brookfield would receive from the Merger.  Appellants argue that the Proxy omitted material information concerning the extraordinary value that Brookfield stood to derive from the Merger:  (i) $130 million from increased management fees; and (ii) more than $1 billion in interest expense savings from refinancing TerraForm's debt.[125]  They contend that knowing the amount of the benefits would have allowed the stockholders to evaluate

---

[124] We note that in denying the motion to dismiss in *PLX*, the Court of Chancery held that:

> In my view, the allegations of the complaint support a reasonable inference that the committee did not take sufficient steps at the outset to determine whether Deutsche Bank faced conflicts of interest before retaining the firm in August 2013.  The complaint supports a reasonable inference instead that the committee hired Deutsche because of the tail provision without conducting adequate inquiry into Deutsche Bank's relationships, whether they could interfere with the sale process and what steps could be taken to address issues.  I also think the allegations of the complaint support a reasonable inference that the committee did not take sufficient steps while overseeing the sale process to determine whether conflicts for Deutsche emerged.

*In re PLX Tech. Inc. S'holders Litig.*, C.A. No. 9880, at 39 (Del. Ch. Sept. 3, 2015) (TRANSCRIPT).  As we said in *RBC Capital Markets*, directors must exercise active and direct oversight of the transaction process.  This oversight includes learning about actual and potential conflicts — not merely checking a box at the outset based upon conclusory representations which are not properly vetted.  *RBC Cap. Mkts.*, 129 A.3d at 855 (directors "need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest.") (internal citation omitted)).

[125] Opening Br. at 32.

(as the Special Committee did) whether Brookfield paid a fair price and whether the Special Committee appropriately leveraged that anticipated value. We conclude that the Proxy's omission of the $130 million Brookfield would receive from the increase in management fees is problematic, but we agree with the trial court's dismissal of the debt refinancing claim.

### a. The Brookfield Management Fee

With regard to the $130 million increase in management fees, the Proxy disclosed that the TerraForm Merger will "likely provide a number of significant benefits" to Brookfield.[126] The Proxy identified these benefits as follows:

> [T]he Brookfield Renewable group is expected to be one of the largest, integrated, pure-play renewable power companies in the world; the Brookfield Renewable group will continue to be sponsored by BAM; the [TerraForm] acquisition would simplify the Brookfield Renewable group's ownership structure and eliminate the public company costs associated with TerraForm Power being a publicly listed company; the [TerraForm] acquisition is expected [to] be accretive to the Brookfield Renewable group's cash flows; a significant portion of TerraForm Power's revenue is under long-term contracts, enhancing the Brookfield Renewable group's contract profile; the [TerraForm] acquisition will further expand the Brookfield Renewable group's portfolio in North America and Western Europe; and the public float of the BEPC exchangeable shares will increase, enhancing liquidity of such shares.[127]

The Proxy also included a complex formula to calculate Brookfield's management fees:

> [I]n exchange for the management services provided to the Brookfield Renewable group by the Service Providers, Brookfield Renewable pays an annual management fee to the Service Providers of $20 million (adjusted

---

[126] Bench Ruling at 37; *see also* A330–A331 (Veres Aff., Ex. 1) (Proxy at 166–67).

[127] A330–A331 (Veres Aff., Ex. 1) (Proxy at 166–67).

annually for inflation at an inflation factor based on year-over-year United States consumer price index) plus 1.25% of the amount by which the market value of the Brookfield Renewable group exceeds an initial reference value. The base management fee is calculated and paid on a quarterly basis. For purposes of calculating the base management fee, the market value of the Brookfield Renewable group is equal to the aggregate value of all outstanding BEP units on a fully-diluted basis, preferred units and securities of the other Service Recipients (including BEPC exchangeable shares) that are not held by Brookfield Renewable, plus all outstanding third party debt with recourse to a Service Recipient, less all cash held by such entities. BRP Bermuda GP Limited L.P., a subsidiary of Brookfield, also receives incentive distributions based on the amount by which quarterly distributions on BRELP units (other than BRELP Class A Preferred Units), as well as economically equivalent securities of the other Service Recipients, including BEPC, exceed specified target levels as set forth in BRELP's limited partnership agreement.[128]

Appellants contend that merely disclosing the formula and not the amount of the projected fees was insufficient.[129] The trial court recognized that this was a "close call," but it ultimately determined that the formula in the Proxy was a sufficient disclosure and that the inclusion of the amount of the anticipated management fees would not have altered the "total mix" of information for stockholders.

We disagree and hold that it is reasonably conceivable that the Proxy's failure to disclose Brookfield's $130 million in projected management fees likely significantly altered the "total mix" of information. As noted by the trial court, a "reasonable stockholder could very well consider a valuable, nonratable [benefit][130] paid to the

---

[128] A482 (Veres Aff., Ex. 1) (Proxy at 348).

[129] A150 (Compl. ¶ 237). *See also* A934 (Veres Aff., Ex. 37) (Morgan Stanley Presentation to the Special Committee dated February 26, 2020, at 51) (calculating the "Net Change in Fees to BAM" to be approximately $130 million over five years).

[130] A non-ratable benefit "exists when the controller receives a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same

49

controller when deciding how to vote."[131]  In rejecting the claim, the Chancellor described the $130 million increase as more of a "business opportunity to Brookfield to reduce costs and increase value[,]"[132]  as opposed to a non-ratable, unique benefit paid to the controller. Even crediting that characterization, we think that Morgan Stanley's description of these fees as a "Key Consideration for the Special Committee" that would warrant a higher premium distinguishes this information from the kind of "tell me more" request which the trial court viewed as more apt.[133]

We next address the question of whether the disclosure of the formula, in the absence of the disclosure of the amount, was a sufficient substitute.  We disagree with the trial court that the fees were "fully described" and that the Proxy provided the "exact formula" that would be used to calculate the fee.

Appellants persuasively argue that the Proxy does not fairly set forth the formula needed to calculate Brookfield's total fees.  To calculate Brookfield's management fees over a five-year period, a stockholder would need to know the multiple variables listed above that go into calculating the base management fee.  Such an endeavor requires consideration of the increase in the market value of the Brookfield Renewable group, the initial reference value, the outstanding third-party debt with recourse to a Service

consideration as all other stockholders." *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *16 (Del. Ch. 2020) (internal quotation marks and citation omitted).

[131] Bench Ruling at 36 (internal quotation marks omitted).

[132] *Id.* at 36–37.

[133] *Id.* at 39; A98–A99 (Compl. ¶ 147).  *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *13 (Del. Ch. 2014).

Recipient, the amount of cash held by such "entities," and the potential impact of payments to BRP Bermuda GP Limited L.P. It is not clear where in the Proxy, or elsewhere, a stockholder must look to find the inputs to calculate the base management fee.[134] Information disclosed in a proxy statement should be presented in a "clear and transparent manner[.]"[135]

Merely because some of the variables needed to complete the calculation are missing does not necessarily equate to a disclosure violation. Although stockholders are entitled to a "fair summary" of a financial advisor's work, disclosures must "'be sufficient for the stockholders to usefully comprehend, not recreate, the analysis.'"[136] But here we have already determined that the projected amount of fees — $130 million — was material. The vague language in the formula cannot reasonably be described as "clear and transparent" or as a sufficient substitute for disclosure of the projected amount of fees.

---

[134] *See Voigt v. Metcalf*, 2020 WL 614999, at *24 (Del. Ch. 2020) (quoting *Vento v. Curry*, 2017 WL 1076725, at *3–*4 (Del. Ch. 2017) ("'A stockholder should not have to go on a scavenger hunt,' then 'piece together the answer from information buried' in a lengthy proxy statement.")).

[135] *Vento*, 2017 WL 1076725, at *4.

[136] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *10 (Del. Ch. 2017) (quoting *In re Merge Healthcare Inc.*, 2017 WL 395981, at *10 (Del. Ch. 2017)). *See also Sommer v. Sw. Energy Co.*, 2022 WL 2713426, at *2 (D. Del. 2022) (a proxy "need not list every variable[,]" rather, "it need only give investors a fair summary of the factors underlying its calculations.") (internal quotation marks and citations omitted)); *Dent*, 2014 WL 2931180, at *12 ("[S]tockholders are entitled only to a fair summary of a financial advisor's work, not the data to make an independent determination of fair value."). In addition, facts are not necessarily material merely because a stockholder may find them to be "helpful." *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("Appellants are advocating a new disclosure standard in cases where appraisal is an option. They suggest that stockholders should be given all the financial data they would need if they were making an independent determination of fair value. Appellants offer no authority for their position and we see no reason to depart from our traditional standards.").

Consequently, even though stockholders are assumed to be "skilled readers,"[137] the disclosure of the anticipated management fees was inadequate.

### b. The Debt Financing Benefit

On the other hand, we are not persuaded by Appellants' argument that the Proxy was deficient because it failed to disclose the $1 billion that Brookfield stood to receive from refinancing TerraForm's debt. A proxy need not disclose information that is "hypothetical" and "inherently speculative."[138] Appellants' own complaint acknowledges the speculative nature of these benefits. For example, they allege that "Brookfield *could* receive significant interest expense savings and incremental management fees from [TerraForm] refinancing its debt[.]"[139] The $1 billion in interest expense savings depends on multiple external factors. Brookfield has no control over future interest rates and market trends, both of which could impact its plan to refinance TerraForm's debt. Delaware law requires that proxies only disclose "certain, known information[.]"[140] The certain, known information that was disclosed here was Brookfield's current outstanding debt, the

---

[137] *See Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) ("[T]he important point is that although stockholders are assumed to be skilled readers, proxy statements are not intended to be mysteries to be solved by their audience.").

[138] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *17 (Del. Ch. 2017). *See also In re Fam. Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at *21 (Del. Ch. 2014) ("Because the magnitude of potential synergies is dependent, at least in part, on the magnitude of divestitures, and because the required divestitures are not currently known, any statement in the Proxy about potential synergies would amount to speculation, which is not an appropriate subject for a proxy disclosure.") (internal quotation marks and citation omitted)); *Arnold*, 650 A.2d at 1280 ("Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information.").

[139] A116 (Compl. ¶ 176) (emphasis added).

[140] *Crane*, 2017 WL 7053964, at *18.

respective maturity dates, and the respective interest rates.[141] This information sufficiently disclosed Brookfield's current debt status without speculating on future hypotheticals. Accordingly, the $1 billion in benefit that would inure to Brookfield from refinancing TerraForm's debt was inherently speculative and, consequently, was not a material fact requiring disclosure.

### 4. Whether the Proxy Failed to Disclose that the Merger Would Dilute the Dividends to TerraForm Stockholders

Next, we address Appellants' argument that the Proxy failed to adequately disclose the estimated 5% dilution of dividends to TerraForm stockholders through 2024.[142] They contend that this reduction of dividends was "critical information" for stockholders to know before they voted on the Merger because the main attractiveness for investors in a yield company, such as TerraForm, is the regular distribution of dividends.[143] Accordingly, a 5% dilution of those dividends would alter the total mix of information for stockholders and, therefore, it should have been adequately disclosed in the Proxy.[144] We agree with the trial court's determination that the dilution of the dividends was adequately disclosed in the Proxy.

---

[141] Bench Ruling at 42.

[142] Opening Br. at 46.

[143] *Id.* at 46–47.

[144] *Id.*

First, the Proxy disclosed that the Merger's impact on dividends was uncertain: "there can be no assurance that Brookfield Renewable or BEPC will make comparable distributions or dividends in the future or at all."[145]

Second, TerraForm stockholders could have reasonably deduced the Merger's impact on future dividends as the trial court concluded.[146] Although Delaware law does not require a stockholder to engage in a "scavenger hunt" in which they must "piece together the answer from information buried in the disclosures[,]"[147] the information needed to determine the dilutive effect on dividends was not buried in the disclosures. Unlike the situation with Brookfield's management fees, to calculate the dilutive effect of the Merger on dividends, a "skilled reader" could first locate TerraForm's and Brookfield's forecasted standalone dividends per share in the Proxy. The Proxy includes TerraForm's "Five-Year Business Plan Model," and explains that the model "reflects, for the years 2020–2024, TerraForm Power's *existing* portfolio of assets[.]"[148] In the accompanying chart, the column titled "Dividends per share" forecasts future dividends for the five-year projection period.[149] On the *following* page, there is a sub-heading titled "Certain BEP

[145] A405 (Veres Aff., Ex. 1) (Proxy at 241).

[146] Bench Ruling at 44 (a "stockholder could [have] reach[ed] the same conclusion on their own[]" when calculating the expected dilution to dividends following the Merger).

[147] *Salladay v. Lev*, 2020 WL 954032, at *16 (Del. Ch. 2020) (internal quotation marks and citations omitted).

[148] A374 (Veres Aff., Ex. 1) (Proxy at 210) (emphasis added) (we view the use of the term "existing" as reasonably meaning TerraForm's then-current assets prior to the Merger).

[149] *Id.*

Forecasts."[150] Two pages later, there is a chart that discloses BEP's five-year Management Forecasts that includes a column titled "[d]istributions per unit."[151] Relatively simple multiplication can show the Merger's dilutive effect on TerraForm's dividends.[152] The inputs needed for such a calculation were adequately disclosed in the Proxy within a few pages of each other — unlike the situation with the management fees. The exchange ratio of 0.381x was noted multiple times in the Proxy. The two relevant tables, TerraForm's Five-Year Business Plan Model and the BEP Management Forecasts, were within three pages of each other in the Proxy.[153] These facts differ from those in Appellants' cited precedent, *Vento*, in which stockholders had to sort through two voluminous documents that were filed ten weeks apart from one another.[154] For these reasons, we find no error with the trial court's dismissal of this claim.

---

[150] A375 (Veres Aff., Ex. 1) (Proxy at 211).

[151] A377 (Veres Aff., Ex. 1) (Proxy at 213).

[152] *See Kahn on Behalf of DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 467 (Del. 1996) ("Simple multiplication would have revealed the allegedly omitted fact. Thus, no material information was withheld and no breach of duty occurred."). As Appellees suggest, one could do simple multiplication to calculate the dilutive effect of the Merger: "multiplying the distributions per unit under BEP's Management Forecasts by the exchange ratio, which is repeated throughout the Proxy, and comparing that figure to the dividends per share under [TerraForm]'s Five-Year Business Plan Model." Answering Br. at 44–45 (internal citation omitted).

[153] *See* A374 (Veres Aff., Ex. 1) (Proxy at 210) (TerraForm's Five-Year Business Model); A377 (Veres Aff., Ex. 1) (Proxy at 213) (BEP Management Forecasts).

[154] *Vento*, 2017 WL 1076725, at *3 ("[A] stockholder can only make a guess about this information by attempting (with great difficulty) to piece together the answer from information buried in a 248-page Amended Registration Statement and an equally lengthy Form 8–K filed more than ten weeks before the Amended Registration Statement.").

*5. Whether the Proxy Failed to Disclose Greentech's Advice to the Special Committee Regarding Timing and Process*

Last, we consider whether the trial court erred with respect to the Proxy's failure to disclose Greentech's advice to the Special Committee regarding the timing and process of the Merger. Appellants contend that the Proxy failed to disclose Greentech's statements to the Special Committee that it was not the "optimal time" to realize the ideal value for TerraForm and that a "robust market check" was necessary.[155] We agree with the trial court's conclusion that this omitted information was not material because Greentech's comments concerning the "optimal" timing and necessity for a "robust market check" are from a January 12, 2020 "pitch" by Greentech to the Special Committee given before negotiations began.[156] Delaware law does not require a "play-by-play description of every consideration or action taken by a Board[,]" because doing so would "make proxy statements so voluminous that they would be practically useless."[157] Here, Greentech's January 12, 2020 presentation to the Special Committee occurred over two months before the Merger's closing and before the substantive negotiations with Brookfield began.

Turning to the presentation's comments on performing a "robust market check," the trial court correctly held that the Special Committee "later reasonably concluded that a

---

[155] Opening Br. at 48. Appellants support this claim by adding that Greentech was "uniquely positioned" to provide advice to TerraForm because it consistently advised it for years prior to the Merger and, therefore, "had a thorough understanding of [TerraForm] and its assets." *Id.* at 50 (internal quotation marks and citation omitted).

[156] A832 (Veres Aff., Ex. 34) (Greentech Proposal to Advise the Special Committee dated January 12, 2020). We note that the presentation's second slide incorrectly states the date as "January 12, 2019" instead of January 12, 2020.

[157] *Crane*, 2017 WL 7053964, at *13 (internal quotation marks and citations omitted).

market check was not necessary, making this disclosure immaterial."[158]  The Proxy explicitly disclosed that the Special Committee decided "not to solicit alternative proposals or transactions[.]"[159]  This was consistent with Morgan Stanley's advice.  It should not be assumed that every suggestion made in an initial pitchbook is worthy of pursuit.  We agree with the Chancellor that the absence of a market check here does not impugn the Special Committee's exercise of due care.  Greentech ultimately determined that the 0.381x exchange ratio was fair, from a financial point of view, to the holders of TerraForm's outstanding shares, other than shares held by Brookfield stockholders.  We are satisfied with the trial court's resolution of the disclosure issues regarding Greentech's advice.

## IV.    CONCLUSION

Because the Proxy was deficient in its failure to disclose certain of the Special Committee's advisors' conflicts of interest and certain management fees Brookfield anticipated from the Merger, and for the reasons set forth above, we REVERSE the Court of Chancery's grant of Defendants' motion to dismiss.

---

[158] Bench Ruling at 34.

[159] A321 (Veres Aff., Ex. 1) (Proxy at 157).